**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Harold B. CHAPMAN, Jr.,
Defendant–Appellant.**

No. 97–15215.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1998.

Decided July 2, 1998.

Catherine W. Johnson, San Francisco, California, for defendant-appellant Harold B. Chapman, Jr.

Lisa E. Jones, United States Department of Justice, Washington, DC, for plaintiff-appellee United States of America.

Before: GOODWIN, KOZINSKI, and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

This suit arises out of the storage and release of hazardous substances on property in Palomino Valley, Nevada. Harold B. Chapman, Jr., who owned the property and operated a business on it, was found liable under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9607(a) ("CERCLA"). On appeal, Chapman contends that the district court erred in granting the government's motion for summary judgment because it had failed to demonstrate a release or threatened release of hazardous substances. Chapman further argues that the EPA acted inconsis-

tently with the National Contingency Plan ("NCP") and therefore is precluded from recovering its response costs.

Finally, Chapman appeals the district court's award of attorney fees as part of the government's response costs. This presents a question of first impression in this circuit: Is the federal government entitled to its attorney fees as response costs under CERCLA § 107(a)(4)(A)?

We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court's award of summary judgment under CERCLA. We also affirm the award of attorney fees under section 107(a)(4)(A), but remand to the district court for a determination of the reasonable amount of such fees.

## I

### FACTS

Harold B. Chapman, Jr. manufactured small metal collars and stored and resold military and commercial surplus chemicals on his five-acre parcel of land in Palomino Valley, Washoe County, Nevada. In 1989, at the request of Washoe County, the EPA began an investigation of Chapman's facility. The EPA hired Ecology & Environment ("E & E") to look into the matter. On October 12, 1989, E & E inspected and photographed the site. This was followed by another inspection by Washoe County one month later.

On December 20, 1989, the EPA's Emergency Response Section and Technical Assistance Team lead by Robert Bornstein, the On Scene Coordinator ("OSC"), conducted a preliminary assessment of the site to determine if a removal action was necessary. They conducted an inventory of all chemical containers and collected samples. There were approximately 2000 5-gallon containers of paint, insulating oil, sulfuric acid, chloroform, alcohols, and other military surplus chemicals on the property. In addition there were 100 55-gallon drums of unknown substances. The majority of the drums were stored outside in an unprotected storage yard. Many of the containers were deteriorated and many of the drums were leaking into the soil. The soil was visibly stained in several areas.

E & E took ten samples of chemicals from the site and tested them. Three samples were flammable, one was a corrosive basic liquid, and four others were combustible.

After the preliminary assessment was completed, the EPA relied upon Washoe County to issue the proper orders to Chapman to bring his property into compliance. In April 1990, Washoe County issued a misdemeanor citation to Chapman for his failure to comply with county orders, and in May 1990 the Washoe County Commissioner revoked Chapman's business license. The County then requested assistance from the EPA.

On May 24, 1990, the EPA issued Order 90-10 pursuant to CERCLA § 106, 42 U.S.C. § 9606(a). This Order stated that the site posed an "imminent and substantial endangerment to the public health or welfare or the environment because of the release or threatened release of hazardous substances. . . ." The Order stated that several contamination threats were identified during the preliminary assessment. Four out of the ten samples had flash points less than 140 degrees Fahrenheit and posed a substantial risk of fire and/or explosion. Many of the drums containing hazardous substances were in poor condition, were leaking into the exposed soil and could migrate causing groundwater contamination. Contamination of the groundwater could result in contamination of the domestic and agricultural aquifer endangering residents and crops. In addition, the site was a danger to the Bureau of Land Management Wild Horse and Burro Adoption Center located a half mile to the south.

The EPA ordered Chapman to take immediate action to secure the site and contain or prevent the release of hazardous substances. Chapman was required to submit site security and safety plans, as well as a detailed Site Removal and Stabilization Plan ("Workplan"). The Order further required Chapman to remove any hazardous substances from the site.

Chapman hired the environmental consulting firm of Jack Quarle & Associates ("JQA") to assist him in complying with the Order. Although JQA submitted a Workplan, it was two months late and found to be inadequate by the EPA because it did not provide for the removal of all hazardous substances from the site or the relocation of hazardous sub-

stances to an approved hazardous waste facility. In addition, the EPA found JQA's inventory was incomplete because it failed to account for 25% of the hazardous materials on site.

On January 8, 1991, the on-site coordinator, Bornstein again visited the site. He found that there were several hundred 1–5 gallon containers of paint waste and flammable liquids and approximately 50 55–gallon drums containing flammable liquids remaining on the property. Some of the containers had open tops, and some were leaking. Visible soil stains remained in the areas where other drums had been stored outdoors.

Because Chapman had failed to take the necessary steps to comply with the EPA's Order, the EPA decided to initiate a response action. The EPA sent its contractor to visit the site and determine what actions were necessary to remove the hazardous substances. In February 1991, when the EPA was prepared to begin its response action, Chapman finally began to comply with the Order. Under the supervision of the EPA and E & E, Chapman removed the containers from the site and conducted soil samples which were submitted to the EPA.

In April 1992, the EPA sent demand letters to Chapman requesting $33,946.00 for the response costs it had incurred. Chapman refused to pay the EPA's costs and the United States brought this civil action against Chapman to collect them. The district court granted summary judgment in favor of the government, and this appeal followed.

## II

## DISCUSSION

We review a grant of summary judgment de novo. *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997);

*Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party (here, Chapman), whether there is any genuine issue of material fact for trial. *Forsyth,* 114 F.3d at 1474.

### A. The EPA's *Prima Facie* Case

To establish a *prima facie* case to recover its response costs under CERCLA § 107, the government has to prove: (1) the site is a "facility"; (2) a "release" or "threatened release" of a hazardous substance occurred;[1] (3) the government incurred costs in responding to the release or threatened release; and (4) the defendant is the liable party. *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989). Once the government presents a *prima facie* case for response costs, the burden shifts to the defendant to prove the government's response action was inconsistent with the National Contingency Plan. *Washington State Dept. of Transp. v. Washington Natural Gas Co.,* 59 F.3d 793, 799–800 (9th Cir.1995); *United States v. Hardage,* 982 F.2d 1436, 1443 (10th Cir.1992).

Chapman argues the government failed to establish a *prima facie* case sufficient for the court to grant summary judgment, because there is a genuine issue of material fact as to whether Chapman caused a release or a threatened release of a hazardous substance on his property.

Before getting to the merits of his case, however, Chapman asserts a procedural argument. He contends that judicial review of a response action under CERCLA must be limited to the administrative record; therefore, he argues, the district court erred by considering evidence outside of that record—specifically the Bornstein declarations regarding the condition of the site—to find a release or threatened release.[2]

---

1. Under CERCLA a release is defined as:

   any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, or other closed receptacles containing any hazardous substance or pollutant or contaminant).... 42 U.S.C. § 9601(22).

2. Section 113(j)(1) of CERCLA provides:

   [J]udicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court. 42 U.S.C. § 9613(j) (CERCLA § 113(j)(1)).

■ We need not consider Chapman's administrative record argument because there is ample evidence in the administrative record to satisfy the government's burden of proof. As the district court stated, the administrative record reflected that

> [t]here were consultant reports. And the facts established that two thousand drums were stored on the property. They were reported to have been rusted and corroded, and without tops, and in poor condition. And there was some evidence of visible soil stains, and soil—and actual soil sample contamination.

The administrative record also includes a report from the EPA's contractor, E & E, explaining the number and type of containers found at the site. Attached to the report is an inventory of the site and analytical results from the samples taken. E & E took ten samples of chemicals from the site and tested the samples. Three samples were flammable, one was a corrosive basic liquid, and four others were combustible. These are hazardous substances under CERCLA. *See* 40 C.F.R. §§ 302.4(b) and 261.21–22.

The administrative record also includes the EPA's Order 90–10. This Order outlines the findings from the EPA's preliminary assessment. The EPA identified approximately 2000 5–gallon containers of paint, insulating oil, sulfuric acid, chloroform, alcohols, and other military surplus chemicals at the site. In addition there were 100 55–gallon drums of unknown substances. The majority of the drums were stored outside in an unprotected storage yard. Many of the containers were deteriorated and several drums were leaking into the soil. The soil was visibly stained in various areas.

The only evidence Chapman presented in opposition to the foregoing evidence were his own declarations. The district court concluded those declarations were not based upon Chapman's own observation, but were hear-say and therefore they failed to create a genuine issue of material fact.

In his first declaration Chapman stated that due to his poor health and mental impairments caused by a stroke, he did not directly manage the facility. Nevertheless, he asserted that all the containers on the property were properly packaged and there were no leaking drums. These assertions were based upon what Chapman was told by his environmental consultant, JQA. The assertions are second-hand hearsay and were inadequate to rebut the evidence in the administrative record presented by the EPA. That evidence established the EPA's *prima facie* case under CERCLA § 107(a).

**B. Consistency with the NCP**

■ The government having established its *prima facie* case under CERCLA § 107(a), the burden then shifted to Chapman to create a genuine issue of material fact on the question whether the EPA's response action was inconsistent with the National Contingency Plan ("NCP"). Chapman failed to do so.

■ The NCP is a national plan the EPA was required to promulgate to guide federal and state response actions. 42 U.S.C. § 9605.[3] "The NCP is designed to make the party seeking response costs choose a cost-effective course of action to protect the public health and the environment." *Washington State Dept. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir.1995).

■ CERCLA § 107(a)(4)(A) allows the government to recover all costs of removal or remedial action "not inconsistent with the national contingency plan." When the United States is seeking recovery of response costs, consistency with the NCP is presumed. *Washington State Dept. of Transp.*, 59 F.3d at 799–800; *United States v. Hardage*, 982

---

**3.** There are two versions of the NCP which are implicated by this case, a 1985 version and a 1990 version. To determine which version of the NCP applies, "we look to the NCP that was in effect at the time [the EPA] incurred response costs, rather than to that in effect when [the EPA] initiated its response actions." *Washington State Dept. of Transp.*, 59 F.3d at 802; *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986).

It appears from the record that the majority of the response costs were incurred beginning in 1990. However, the preliminary site assessment and E & E's initial inspection occurred in late 1989. We apply the 1990 version of the NCP to the majority of the response costs unless otherwise indicated.

F.2d 1436, 1442 (10th Cir.1992). The potentially responsible party has the burden of proving inconsistency with the NCP. *Washington State DOT*, 59 F.3d at 800. "To prove that a response action of the EPA was inconsistent with the NCP, a defendant must prove that the EPA's response action was arbitrary and capricious." *Id.*; 42 U.S.C. § 9613(j)(2).

### 1. The Removal Order

Chapman argues the EPA's response action was inconsistent with the NCP because the EPA's removal order was arbitrary and capricious in that it ordered removal of material from Chapman's property without first determining whether that material was hazardous. We disagree. Before issuing its Order, the EPA inventoried and sampled the containers at the site as part of its preliminary assessment. EPA Order 90–10 details the EPA's actions as well as the nature and extent of the threat at the Chapman site. The EPA's preliminary assessment identified hundreds of drums and containers of chemicals and oils. The drums were stored outside in an unprotected storage yard and many of them were deteriorated. The soil was visibly stained. In addition, E & E took soil samples that showed the substances were hazardous under CERCLA.

The EPA did not act arbitrarily or capriciously in ordering removal of the material. Prior to issuing its Order 90–10, the EPA concluded, after careful investigation and evaluation, that the site posed a threat, and removal or remedial action was necessary.

### 2. Documentation

The NCP requires:

During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery.

40 C.F.R. § 300.160(a)(1) (1990).[4]

Contrary to Chapman's argument, the EPA adequately documented its response action and the costs incurred.

The government submitted detailed cost summaries to the district court documenting the costs incurred by the EPA. The district court record contains declarations from EPA staff, attorneys, accountants, and supervisors attesting to the work they performed and the time spent on the Chapman site. Additionally, the record contains extensive documentation of costs in the form of timesheets and payroll documents.

Although the EPA adequately documented its expenditures, its documentation of its response action presents a more difficult problem. The declarations submitted by the EPA provide documentation of the actions taken at the site, but information in the administrative record is less complete. The administrative record contains E & E's site assessment and inventory; E & E's cost estimate and cost projections for the site; and Order 90–10 outlining the EPA's preliminary assessment and proposed course of action. In addition, the administrative record contains various letters from the EPA to Catherine Johnson, Chapman's counsel, and JQA, Chapman's environmental consultant, detailing the actions Chapman was required to take to clean up the site.

The problem is that the administrative record ends in September 1990 and the response action did not end until February 1991. Even so, from December 17, 1990 to January 18, 1991, the administrative record was made available for public comment before it was made final. However, only OSC Bornstein's declaration and action memorandum cover the remaining period and document the EPA's actions and costs.

In his declaration dated October 26, 1995, Bornstein explains that he inspected the site on January 8, 1991 and prepared an action memorandum. The EPA hired a contractor, Reidel Environmental Services, to perform response activities at the site. Bornstein states that the EPA documented its activities and maintained records including an E & E report on February 28, 1991; a Technical Assistance Team contract between the EPA and E & E; and an Emergency Response

---

**4.** The 1985 version of the NCP contains almost identical language. See 40 C.F.R. § 300.69 (1985).

Cleanup Services Contract between the EPA and Reidel. In his action memorandum dated January 24, 1991, Bornstein provides a detailed assessment of the site as well as his proposed action and the estimated costs.

The EPA's documentation of its response action and costs is consistent with the requirements of the NCP.[5] The administrative record adequately documents the EPA's actions through September 1990, and the declarations, contracts, and action memorandum document the actions taken for the remaining period. In addition, the EPA kept extensive records of recovery costs in the form of timesheets, cost estimates, and accountant and attorney declarations. The district court was correct in concluding that the EPA acted consistently with the NCP in maintaining appropriate documentation.

### 3. Current Site Evaluation

In determining the appropriate extent of action to be taken in response to a given release, the lead agency shall first review the removal site evaluation (preliminary assessment), any information produced through a remedial site evaluation plan, if any has been done previously, and the current site conditions, to determine if removal action is appropriate.

40 C.F.R. § 300.415(a)(1) (1990).[6]

Chapman argues that the EPA failed to review the preliminary assessment and current site conditions before determining that a removal action was appropriate. Chapman reiterates his earlier argument that the preliminary assessment does not demonstrate a release or threat of release and therefore the EPA's decision to take removal action was arbitrary and capricious.

The preliminary assessment is contained in the administrative record and it clearly documents the conditions at the site. OSC Bornstein's action memorandum dated January 24, 1991 provides a detailed assessment of the site conditions at that time. Based upon both the preliminary assessment and the action memorandum, the EPA considered all the necessary information in determining a removal action was appropriate.

### 4. Mandatory Factors

In determining the appropriateness of a removal action, the EPA must consider the following factors: (1) actual or potential exposure to nearby human populations, animals, or the food chain; (2) actual or potential contamination of the water supply; (3) hazardous substances in drums, barrels or containers that may pose a threat of release; (4) hazardous substances in soils near the surface that may migrate; (5) weather conditions that may cause migration; (6) threat of fire or explosion; (7) the availability of other federal or state response mechanisms; and (8) other factors that may pose threats to public health or welfare. 40 C.F.R. § 300.415(b)(2) (1990).[7]

Chapman argues that the EPA failed to address these factors prior to determining a removal action was necessary. The administrative record refutes this assertion. Order 90–10 reflects consideration of all but one of the specific factors listed in 40 C.F.R. § 300.415(b)(2) (1990). The Order considers: (1) actual or potential exposure of the animals and people at the Bureau of Land Management Wild Horse and Burro Adoption center; (2) the potential contamination of the groundwater that could result in contamination to the domestic and agricultural aquifer endangering residents and crops; (3) the hazardous substances in the drums that pose a threat of release; (4) the substances leaking into the soil that may potentially migrate to the aquifer underlying the site and cause contamination; (5) the many drums stored outside in the elements containing substances with flash points of less than 140 degrees; (6) the risk of fire and/or explosion from drums containing flammable substances.

The only specific factor not considered explicitly in the Order is the availability of other state or federal response mechanisms. It is clear, however, from other portions of

---

**5.** The section of the NCP involving documentation of response actions and costs does not limit the admissible documentation to the administrative record. *See* 40 C.F.R. § 300.160(a)(1).

**6.** The 1985 version of the NCP contains similar language. See 40 C.F.R. § 300.65(a)(1) (1985).

**7.** The 1985 version of the NCP contains the same language. 40 C.F.R. § 300.65(b)(2) (1985).

the administrative record that this factor was considered. The EPA worked in conjunction with Washoe County prior to issuing the Order. The EPA initially relied on the County to issue the necessary orders to bring the property into compliance. When the County's attempts failed, the EPA stepped in and issued Order 90–10. The EPA acted consistently with the NCP and considered all the factors required in deciding upon a removal action.

### 5. Community Relations Plan

The NCP specifies the necessary community relations activities to be taken in a removal action. The 1990 NCP requires that in removal actions where "on-site action is expected to extend beyond 120 days from the initiation of on-site removal activities," the EPA shall prepare a formal community relations plan. 40 C.F.R. § 300.415(n)(3) (1990). The plan should address the public's concerns and outline any community relations activities that the EPA expects to undertake. *Id.* at (n)(3)(ii).

The 1985 NCP requires the same formal community relations plan, but the plan is required if the on-site removal activities are expected to extend beyond 45 days. 40 C.F.R. § 300.67(b) (1985).

■ Chapman contends the 1985 version of the NCP applies. We conclude, however, that the 1990 version applies. The EPA issued Order 90–10 in May 1990 instructing Chapman to take removal action. At the time the Order was issued, the EPA set the target dates for the response activity at the site. The Order states that all hazardous substances they stored at the site were to be removed within 120 days from the effective date of the Order.

Chapman argues that even if the 1990 version of the NCP applies, the EPA failed to comply with it because post-removal soil sampling could occur 130 days from the effective date of the Order. We reject this argument. Post-removal soil sampling is irrelevant to whether the EPA expected the on-site removal activities to extend beyond 120 days.

The EPA's actions were consistent with the NCP because it ordered Chapman to complete the on-site removal within 120 days.

The 1990 version of the NCP applies. Because removal activities on Chapman's property were not to extend beyond 120 days, the EPA was not required to issue a community relations plan.

### C. Response Costs

To this point we have determined the district court correctly held that the EPA established a *prima facie* case which Chapman failed to rebut, and the EPA's response action was not inconsistent with the NCP. The effect of this is that the district court also correctly held that the EPA is entitled to recover its response costs.

■ The question we now consider is whether the government can recover, as part of these response costs under section 107(a)(4)(A), its attorney fees attributable to this litigation. The district court held these fees were recoverable. We agree, but conclude the government is not entitled to the actual attorney fees attributable to the litigation, but only to reasonable attorney fees.

Our analysis begins with the Supreme Court's decision in *Key Tronic Corp. v. United States,* 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). There, the Court held that CERCLA § 107 does not provide for the award of attorney fees to a *private party* bringing a cost recovery action. Attorney fees are generally not recoverable "absent explicit congressional authorization." *Id.* at 814, 114 S.Ct. 1960 (citing *Runyon v. McCrary,* 427 U.S. 160, 185, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) and *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). CERCLA § 107(a)(4)(B) allows private parties to recover the "necessary costs of response," but this does not explicitly authorize a cause of action for the recovery of attorney fees. *Id.* at 813, 114 S.Ct. 1960. The Court compared the private party provision of section 107(a)(4)(B) with other provisions in the SARA amendments that expressly provide for attorney fees and concluded that the omission of express language from section 107(a)(4)(B) suggested a deliberate decision by Congress not to authorize the award of attorney fees in private recovery actions. *Id.* at 818–819, 114 S.Ct. 1960. The

Court further stated that it would "stretch the plain terms of the phrase 'enforcement activities' too far to construe it as encompassing the kind of private cost recovery action at issue in this case." *Id.* at 819, 114 S.Ct. 1960.

The Court expressly declined, however, to determine whether attorney fees are recoverable by the *government*, stating "we offer no comment" on whether "enforcement activities" entitles the government to recover its attorney fees under section 107.[8] *Id.* at 819, 114 S.Ct. 1960. In dicta, the Court noted that district courts have generally agreed that the government is entitled to recover litigation expenses including attorney fees as part of its cleanup costs. *Id.* at 817, 114 S.Ct. 1960. "Congress arguably endorsed these holdings, as well, in the SARA provision redefining the term 'response' to include related 'enforcement activities.'" *Id.* at 817–818, 114 S.Ct. 1960.

Since *Key Tronic* was decided, only one circuit has addressed the issue of government cost recovery. In *B.F. Goodrich v. Betkoski,* 99 F.3d 505 (2d Cir.1996), *petition for cert. filed,* —— U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998), the Second Circuit distinguished *Key Tronic* as applying only to private cost recovery actions, and held that attorney fees are recoverable by the government as response costs under CERCLA. *Id.* at 528. The Second Circuit analyzed the statute and determined that because "respond" is defined in 42 U.S.C. § 9601(25) to mean "remove, removal, remedy or remedial action," and these terms include "enforcement activities related thereto," "the government's recoverable response costs properly include not only the obvious costs of remedia-

tion, but also include, *inter alia,* attorneys' fees." *Id.* (citing to *United States v. Gurley,* 43 F.3d 1188, 1199–1200 (8th Cir.1994) and *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1504 (6th Cir.1989)).[9]

Two district courts have held that the government is entitled to recover its litigation costs from a liable party pursuant to sections 107(a)(4)(A) and 104(b). *United States v. Northeastern Pharm. & Chem. Co.,* (*NEPACCO* ), 579 F.Supp. 823 (W.D.Mo.1984), *aff'd in part and rev'd in part on other grounds,* 810 F.2d 726 (8th Cir.1986); *United States v. South Carolina Recycling & Disposal, Inc.,* (*SCRDI* ), 653 F.Supp. 984, *aff'd in part and vacated in part on other grounds, United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988).

In *NEPACCO,* the court stated that the "language of CERCLA confirms that the government has very broad cost recovery rights." *NEPACCO,* 579 F.Supp. at 850. CERCLA specifically allows for the recovery of attorney fees because section 107(a) allows for the recovery of "all costs of removal or remedial action." *Id.* at 851. CERCLA § 101(23) defines a removal action as an action pursuant to section 104(b), and section 104(b) allows the government to "undertake such planning, *legal,* fiscal, economic, engineering or architectural, and other studies or investigations as [it] may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter." *Id.* (emphasis added).[10] Therefore, the government is entitled to recover "all litigation costs, including attorney fees." *Id.*

---

**8.** Under section 107(a)(4)(A), a covered person is liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian Tribe not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). In contrast, CERCLA § 107(a)(4)(B), allows a private party to recover "any other necessary costs of response." 42 U.S.C. § 9607(a)(4)(B).

**9.** Section 9601(25) provides:
The terms "respond" or "response" means *remove, removal, remedy, remedial action;* all such terms (including the terms "removal" and "remedial action") include enforcement activities related thereto.

42 U.S.C. § 9601(25).

**10.** CERCLA § 104(b) is codified at 42 U.S.C. § 9604(b)(1). This section provides that "whenever the President is authorized to act pursuant to sub-section (a) of this section [to remove or arrange for the removal of, and provide remedial action relating to hazardous material] ... [t]he President may undertake such planning, *legal,* fiscal, economic, engineering, architectural, and other studies or investigations as he may deem *necessary or appropriate to plan and direct re-*sponse actions, to recover the costs thereof, and to enforce the provisions of this chapter."

Similarly, the *SCRDI* court found that attorney fees are recoverable by the government. The court concluded that given the "broad language of the statute" and the "cogent" analysis in *NEPACCO*, responsible parties should be liable to the government for attorney fees. *SCRDI*, 653 F.Supp. at 1009.[11]

We are persuaded by the Second Circuit's reasoning in *B.F. Goodrich* and the Missouri District Court's analysis in *NEPACCO*. CERCLA § 107(a)(4)(A) allows for the recovery of "all costs" of a removal or remedial action. Section 104(b) allows the government to recover costs for all of its investigation and activities, including legal work. Additionally, section 101(25) specifically states that a response action includes "enforcement activities." We conclude that statutory authority permits the government, which is the prevailing party in this litigation, to recover attorney fees attributable to the litigation as part of its response costs.

Chapman argues that the Supreme Court's analysis in *Key Tronic* should be applied to section 107(a)(4)(A) to reach a result consistent with the private party recovery analysis of section 107(a)(4)(B). The two sections, however, are distinguishable. First, as the Court noted in *Key Tronic*, in the SARA amendments redefining the term response to include "enforcement activities," Congress arguably endorsed the holdings in *SCRDI* and *NEPACCO*. *Key Tronic*, 511 U.S. at 817 & n. 9, 114 S.Ct. 1960. The Court stated: "According to the House Committee Report on this Amendment, § 101(25)'s modification of the definition of 'response action' to include the related enforcement activities 'will confirm the EPA's authority to recover costs for enforcement actions taken against responsible parties.'" *Id.* at 818 n. 10, 114 S.Ct. 1960 (citing H.R.Rep. No. 99–253, p. 66–67 (1985)).

Further, it does not end the analysis to simply say that CERCLA §§ 107(a)(4)(A) and 104(b) do not use the term "attorney fees." "The absence of a specific reference to attorney's fees is not dispositive if the statute otherwise evinces an intent to provide for such fees." *Id.* at 815, 114 S.Ct. 1960. Congress does not have to "incant the magic phrase 'attorney's fees'" where it has "explicitly authorized the recovery of costs of 'enforcement activities'" and enforcement activities naturally include attorney fees. *Key Tronic*, 511 U.S. at 823, 114 S.Ct. 1960 (Scalia, J. dissenting). Section 107(a)(4)(A) evinces an intent to provide for attorney fees because it allows the government to recover "all costs of removal or remedial action" including "enforcement activities."

Finally, there are persuasive policy arguments in favor of awarding the government its attorney fees. CERCLA is remedial legislation that should be construed liberally to carry out its purpose. *Atlantic Richfield*, 98 F.3d at 570. Congress intended to "facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for hazardous wastes." *Washington DOT*, 59 F.3d at 799 (citing *R.W. Meyer*, 889 F.2d at 1500).

In this case, Chapman was given the opportunity to clean up his property without EPA involvement. When Chapman failed to act, the EPA stepped in and Chapman finally cleaned up the site. By the time the cleanup was complete, the EPA had incurred approximately $34,000 in response costs. It demanded payment of these costs from Chapman. Chapman refused to pay, and as a result the EPA was forced to take legal action to recover its costs.

The award of attorney fees to the government in this case can act as a powerful deterrent to other parties responsible for the cleanup of hazardous materials. The threat of attorney fees should encourage other parties in Chapman's position to take remedial action on their own when requested by the

11. Other circuits have addressed related issues involving the scope of response costs under CERCLA § 107(a). The Eighth Circuit in *Gurley* held that attorney fees are recoverable as an administrative cost. The court held that the government's attorney fees associated with identifying potentially responsible parties were recoverable as "a necessary part of the EPA's legitimate enforcement activities." *Gurley*, 43 F.3d at 1200. *But see United States v. Dico, Inc.*, 136 F.3d 572 (8th Cir.1998) (vacating the decision of the district court regarding the recovery of indirect and oversight costs under § 107(a) and stating the issue is reserved for "another day, and quite possibly another case.")

government. Who knows, it might even encourage responsible parties not to pollute and contaminate property in the first place.

We affirm the district court's award of attorney fees to the government under CERCLA § 107(a)(4)(A). We next consider the amount of that award.

## D. Reasonableness of Fees

Chapman's final argument is that even if the EPA is entitled to its attorney fees, the court has a duty to impose reasonable limits on the recovery of those fees. Chapman argues that the award of over $400,000 in attorney fees in this case, when the EPA's claim was for $34,000, runs afoul of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

In *Hensley*, the Supreme Court held that the extent of a plaintiff's success is a key factor in determining the proper amount of attorney fees recoverable by a "prevailing party" under 42 U.S.C. § 1988. *Id.* at 440, 103 S.Ct. 1933. The Court outlined the proper analysis for determining reasonable attorney fees. *Id.* at 431–32, 103 S.Ct. 1933. In a footnote, the Court emphasized that its decision extended beyond civil rights cases. "The standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'" *Id.* at 433 n. 7, 103 S.Ct. 1933.

We have extended the application of *Hensley* to the award of attorney fees in cases where the statute does not specifically limit awards to the "prevailing party." *D'Emanuele v. Montgomery Ward & Co. Inc.*, 904 F.2d 1379, 1382 (9th Cir.1990) (holding that the standards established in *Hensley* for determining the amount of attorney fees are applicable to the award of attorney fees under ERISA which does not include a "prevailing party" provision).

We vacate the district court's attorney fee award, and remand this case to the district court for it to consider the reasonableness of the government's requested litigation expenses. In making this determination, the court should be guided by the standards set forth in *Hensley:*

> We reemphasize that the district court has discretion in determining the amount of a fee award. This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters. It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award.

*Hensley,* 461 U.S. at 437, 103 S.Ct. 1933.

## III

## CONCLUSION

We affirm the district court's summary judgment in favor of the government. The EPA established a *prima facie* case under CERCLA § 107 for the recovery of its response costs. Chapman failed to raise a genuine issue of material fact to defeat that *prima facie* case. The government's response costs were not inconsistent with the National Contingency Plan. Those costs properly included reasonable attorney fees attributable to this litigation.

The district court, however, awarded the government all of its claimed attorney fees, without subjecting that claim to a test of reasonableness. We, therefore, vacate the district court's award of attorney fees and remand this case to the district court for it to award a reasonable amount of attorney fees in favor of the government consistent with the standard set forth in *Hensley.*

The parties shall each bear their respective costs and attorney fees for this appeal.

AFFIRMED in part; REVERSED in part; and REMANDED.